IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| ANNETTE COMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 04-1149-ST |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of Social | ) | FINDINGS AND |
| Security, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

STEWART, Magistrate Judge:

## **<u>INTRODUCTION</u>**

Plaintiff, Annette Comer, brings this action for judicial review of a final decision of the

Commissioner of Social Security denying her applications for disability insurance benefits ("DIB")

and supplemental security income payments ("SSI") under Titles II and XVI of the Social Security

Act. The court has jurisdiction under 42 USC §§ 405(g) and 1383(c). The Commissioner's decision

should be reversed and remanded for further proceedings.

**BACKGROUND**

Comer was born October 11, 1945. Tr. 94.[1] She has a high school education. Tr. 624. Comer worked in the past as a grocery clerk, dryer feeder in a plywood mill, veneer patcher or plugger in a plywood mill, bartender, cashier and assistant apartment manager. Tr. 619, 644, 1303, 1308. She last worked in August 1993. Tr. 618.

Comer initially alleged disability beginning August 2, 1993, due to fibromyalgia, osteoarthritis, diabetes, degenerative disc disease, bilateral knee impairments, stress, hypertension, depression, anxiety, somatoform disorder, chronic pain, chronic fatigue, gastroesophageal reflux disease and heart disease. Tr. 94, 618. She later amended the alleged onset date to her 50th birthday, October 11, 1995. Plaintiff's Opening Brief at 3.

Comer's applications were denied at all levels until reaching the Court of Appeals, which reversed and remanded for further proceedings. Tr. 554-64. After a second administrative hearing, a different ALJ denied Comer's claim for DIB benefits and also her claim for SSI payments prior to her 55th birthday. Tr. 456-71. The appeal of that decision is now before this court. During the pendency of the present claims, Comer filed a subsequent application for SSI under Title XVI and was found disabled beginning December 1, 2000. Tr. 588. She has been receiving SSI payments since January 2001. Tr. 1303.

Comer satisfied the insured status requirements for DIB benefits under Title II through December 31, 1998. Tr. 577. She must show that she became disabled on or before that date to prevail on her claim for DIB. 42 USC § 423(a)(1)(A). There is no insured status requirement for

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 8).

a claim for SSI benefits under Title XVI. 42 USC § 1382(a). Accordingly, the relevant period for Comer's SSI claim is from her alleged onset of disability on October 11, 1995, through December 1, 2000, when she was found disabled pursuant to her subsequent claim.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR §§ 404.1520, 416.920. Comer does not challenge the ALJ's conclusions in the first four steps of the decision.

For the purposes of step five, the Commissioner must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 CFR §§ 404.1520(e), 416.920(e), 404.1545, 416.945; Social Security Ruling ("SSR") 96-8p.

When the adjudication reaches step five, the Commissioner must determine whether the claimant can perform any work that exists in the national economy. *Yuckert*, 482 US at 141-42; 20 CFR §§ 404.1520(f), 416.920(f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 US

at 141-42; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR §§ 404.1566, 416.966.

## THE ALJ's FINDINGS

The ALJ found that Comer had medically determinable impairments that significantly limited her ability to perform basic work activities. He assessed her RFC for the period preceding the expiration of her insured status as follows:

> [P]rior to December 31, 1998, the claimant retained the residual functional capacity to frequently lift 10 pounds and occasionally lift up to 20 pounds; would require a sit/stand option; would require a job with low stress and no strict quality standards or production rates and only occasional public contact; and, could follow simple routine tasks and instructions.

Tr. 468.

The ALJ did not articulate a different RFC assessment for the period from January 1, 1999, to December 1, 2000, the end of the relevant period for Comer's SSI claim.

The ALJ found that with this RFC, Comer remained able to perform work in the national economy. He identified two examples of such work drawn from the testimony of the impartial vocational expert ("VE"): office helper and mail clerk. Tr. 469.

The ALJ concluded that Comer was not disabled within the meaning of the Act at any time before her insured status expired on December 31, 1998. Accordingly, he denied Comer's Title II claim for DIB. Tr. 469-70.

The ALJ decided Comer's Title XVI claim for SSI by applying the Medical Vocational Guidelines in 20 CFR Part 404, Subpart P, Appendix 2, based on Comer's vocational factors of age, education, work experience, and the RFC assessment quoted above. He found Comer disabled upon

reaching age 55 on October 11, 2000, pursuant to Rule 202.06 of the Medical Vocational Guidelines. Tr. 471.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## DISCUSSION

Although Comer does not challenge the ALJ's purported application of the RFC assessment in determining her Title XVI claim, it is problematic. The period for Comer's Title XVI claim extends beyond December 31, 1998, the date of the ALJ's RFC assessment. In addition, the Medical Vocational Guidelines cannot be determinative if the claimant is unable to perform the full range of work at the appropriate level of exertion. SSR 83-12. The RFC assessment includes limitations that preclude Comer from performing the full range of light work. Accordingly, the ALJ's conclusion that Comer was not disabled between December 31, 1998, and October 11, 2000, cannot

be sustained based on the ALJ's RFC assessment and application of the Medical Vocational Guidelines. For this reason alone, a remand is necessary.

With respect to her Title II claim, Comer challenges the ALJ's RFC assessment by contending that the ALJ: (1) improperly discredited her subjective statements about her impairments and functional limitations; (2) rejected the opinions of medical sources; and, (3) failed to evaluate her mental limitations in accordance with regulatory procedures. Comer also contends that the ALJ reached his conclusion in step five that she can perform other work in the national economy based on legally inadequate vocational testimony that did not consider all of her limitations and conflicted with information in the *Dictionary of Occupational Titles.*

## I.    **RFC Assessment**

### A.    **Credibility Determination**

During the first hearing, Comer testified that her high blood pressure, asthma and shortness of breath were under control with medication. Tr. 47, 52, 58. She could sit for about one hour before it caused pain in her back. Tr. 50. Standing for about ten minutes made her feel sick from pain in her neck, shoulders, feet, ankles and knees, but she could stand for about one hour. Tr. 51. Walking one or two blocks caused pain and stiffness in the joints of her hips, knees, feet and ankles. Tr. 51-52. Holding her head up while walking caused pain in her neck. Tr. 52. Lifting anything heavier than a gallon of milk "could very likely put [her] back out again" and irritate her neck. Holding anything heavy would cause pain in the knees. *Id.*

Comer testified that she would not be able to do sedentary work involving simple tasks without public contact because she would have to lie down and using her hands would be painful. Tr. 57.

In its remand memorandum, the Court of Appeals found that the first ALJ failed to properly consider Comer's subjective testimony. Tr. 558-59. At the second hearing, Comer testified that her condition had continued to deteriorate and her pain remained about the same. Tr. 1306. Comer now contends that the second ALJ again improperly rejected her allegations.

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993); *Smolen v. Chater*, 80 F3d 1273, 1283 (9th Cir 1996). The ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill*, 12 F3d at 917-18; *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995); *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

Here the ALJ considered the proper factors, and his conclusion that Comer's subjective allegations lacked credibility is supported by substantial evidence in the record as a whole.

First, the ALJ found that the medical records did not include clinical and laboratory diagnostic findings that support the degree of functional limitation Comer alleged. Tr. 466. The

objective medical findings relating to her alleged impairments were consistently mild during the relevant period. For example, objective and clinical evidence did not support Comer's allegations of severe neck and back pain. Images of her spine showed mild degenerative changes without central canal or foraminal neural involvement. Tr. 376, 377, 449.

In June 1996, Peter A. Grant, MD, performed an electrodiagnostic evaluation of Comer's shoulder and neck complaints. Tr. 309-17. On physical examination, Comer presented tenderness to palpation and reduced range of motion with pain at the extremes, but had no weakness or muscle atrophy in either upper extremity. Tr. 310. The electrodiagnostic evaluation did not reveal any neurophysiologic abnormalities to correlate with the symptoms she alleged; all her results were normal. Dr. Grant concluded that she remained capable of performing "medium duty work activities." Tr. 311.

In March 1997, Michael K. Peterson, MD, evaluated Comer for fibromyalgia and concluded that she did not meet the diagnostic criteria. Tr. 408. Dr. Peterson found that she had mild degenerative joint disease and hypertension. Tr. 409. He opined that her musculoskeletal pain complaints represented somatization and did not disable her. Tr. 412.

In December 1998, Thomas Ewald, MD, evaluated Comer for complaints of chronic diffuse musculoskeletal pain. Tr. 734-36. He found that she had reduced flexion in the neck, but no range of motion limitations in the rest of her back, shoulders or extremities. Tr. 735. Dr. Ewald found no weakness or atrophy and obtained normal results on her sensory examination and straight leg raise, knee flexion and hip flexion tests. *Id.* Imaging studies showed only mild degenerative changes. *Id.*

In October 2000, Dr. Peterson performed an evaluation for continuing back pain and found that Comer had moderately limited range of motion in the back, but could walk normally with an

even gait and perform heel and toe rises.  Tr. 749-50.  She had no problem with straight leg raises, no localized tenderness and no detectable muscle atrophy or weakness.  *Id.*  Based on his examination and a review of all available radiology reports, Dr. Peterson encouraged Comer to maintain a medium activity level.   Tr. 750.

The clinical and objective evidence did not support Comer's allegations of functional limitations from fibromyalgia.  In December 1998, Dr. Ewald found multiple tender points on palpation suggesting probable fibromyalgia.  Tr. 735.  However, as noted above, Dr. Peterson found the clinical diagnostic criteria absent in March 1997.  Tr. 408-12.   In April 2001, Comer underwent a consultative evaluation by Steven R. Foutz, MD, for fibromyalgia and orthopedic impairments.  Tr. 1007-14.   Dr. Foutz found that she had a strong tendency toward pain behavior and magnification (Tr. 1014) and that she was "universally positive to palpation" including fibromyalgia tender points and control points.  Tr. 1013.

The medical evidence does not support Comer's allegations of severe functional deficits from hypertension and heart disease.  The  evidence shows chronic high blood pressure controlled by medication.  Tr. 383, 393.  Radiological images of her chest from June 1996 show only slight enlargement of the heart without evidence of functional deficits in the heart or lungs.  Tr. 375.  In February and March 1998, Comer underwent extensive testing for intermittent chest pain and shortness of breath.  Clinically, she had clear lungs and normal heart function without edema. Tr. 895.  A stress dual isotope treadmill study showed no signs of myocardial ischemia, previous infarction or arrhythmia of any significance; her ejection fraction was within the normal range and she had a low probability of coronary artery disease.  Tr. 721-22, 983.  Medical personnel evaluated the isotope treadmill stress test as normal.  *Id.*

In January 2001, chest x-rays showed Comer's heart size unchanged or improved since 1996 and still within the upper limits of the normal range. Tr. 784, 968. Her pulmonary vascular caliber and lungs remained normal. *Id.* Evidence of heart dysfunction in May 2001 was well after the relevant period for this case. Tr. 1066, 1201.

The medical records do not support Comer's allegations of severe limitation from bilateral knee problems during the relevant period. MRI scans in 1994 were unremarkable for soft tissue abnormalities and showed all ligaments intact. Tr. 212. Comer had a meniscus tear repaired in a routine arthroscopy procedure without complications. Tr. 215-216, 706. Between October 1999 and January 2000, Comer had injections of hyaluronic acid for lubrication and cushioning of both knees. Tr. 742. In November 2000, she had symptoms of degenerative joint disease in the knees, but no objective or clinical findings other than mild crepitus. Tr. 748. Radiology images in April 2001 showed bilateral osteoarthritis of the knees, worse on the right. Tr. 1016. Again, the objective evidence of knee dysfunction relates to the period for which she has already been determined to be disabled.

The medical records do not support Comer's allegations of severe functional limitations from depression and anxiety. Comer received treatment from psychiatrist Neil Williamson, MD. He indicated that Comer was significantly impaired by her mental condition in March 1996, but improved when she was compliant with prescribed medications. Tr. 346-50, 1039. Although Dr. Williamson opined that she was disabled by other medical conditions Comer described to him, he felt her psychological condition was controlled and stable. Tr. 1027-36.

The objective and clinical evidence does not reveal any likely cause for, or support Comer's allegations of functional limitations from gastroesophageal reflux disease, irritable bowel syndrome,

heartburn or stomach discomfort. In August 2000, Carlos Marchini, MD, performed a 24-hour pH study that showed no evidence of significant reflux. Tr. 1102. An esophagram barium swallow was entirely normal. Tr. 1199. A colonoscopy showed no evidence of any diverticulosis, polyps, tumors or other pathology. Tr. 746.

The record reflects that Comer had recurrent difficulty controlling her blood sugars during the relevant period. This is must be attributed, at least in significant part, to Comer's persistent noncompliance with medication prescriptions and treatment recommendations for exercise and diet control, as discussed more fully below. Comer underwent regular vision, dental and foot examinations, which did not reveal any complications with significant functional limitations during the relevant period. Tr. 903.

These objective and clinical findings do not correlate with Comer's allegations of debilitating functional limitations during the period that is relevant for her claims. The ALJ's conclusion that the record lacks medically acceptable clinical and laboratory diagnostic evidence supporting the degree of functional limitation Comer alleged is supported by substantial evidence.

The ALJ also found that Comer's noncompliance with prescribed medications and treatment recommendations damaged her credibility. Tr. 466. In September 1993, Comer had improved control over hypertension, asthma and depression/anxiety symptoms while compliant with medications. Tr. 249. She discontinued medications for these conditions soon afterwards, without consulting her medical providers. Tr. 252. This episode predates the period that is relevant for Comer's claims, but illustrates a pattern that she repeated over and over again throughout the record. Tr. 265, 267, 294, 318, 328, 330, 392-93, 1062, 1079, 1080, 1168.

Comer argues that she had good reasons to stop taking her medications because they made her symptoms worse. On one occasion a treating physician opined that she properly stopped taking one hypertension medication because it made her asthma slightly worse. Tr. 282. Comer reported increased asthma symptoms with all of the hypertension medications she tried. This argument is not entirely persuasive, however, because her asthma and blood pressure were controlled during periods when she was compliant with prescriptions for reactive airway disease and hypertension. Tr. 253, 255, 257, 269, 852, 1262.

The persuasiveness of her argument is further diminished by Comer's purported inability to tolerate any of the treatments recommended for her various ailments. For example, she did not tolerate ice for musculoskeletal pain because it reportedly made her symptoms worse. Tr. 318. She did not tolerate a continuous positive airway pressure device ("CPAP") "because of her fibromyalgia and other problems." Tr. 1079. Comer has repeatedly discontinued antidepressant medications without explanation. Tr. 350, 1168, 1243. The ALJ could reasonably find this broad and poorly explained resistence to treatment recommendations as indicative that Comer's symptoms were not as severe as she alleged. Most troubling is Comer's persistent failure to follow repeated instructions from medical providers throughout the record for exercise, water aerobics, swimming, diet control and weight loss. Tr. 301, 324, 326, 332, 383, 393, 785, 1063, 1075, 1192. The ALJ could reasonably conclude that if Comer had been experiencing the severe symptoms she claimed, then she would have made a greater effort to comply with treatment recommendations.

The ALJ also relied on indications of questionable motivation in the treatment notes. Tr. 467. In September 1996, after referring Comer for physical therapy, Dr. Grant noted:

She later mentions that her main problem is Social Security disability and that she has been turned down by them. I wonder if this was not one of the main reasons for her appointment today.

Tr. 318.

Comer correctly points out that the Social Security Act requires her to seek medical documentation to support her claims. She argues that Dr. Grant's statement merely reflects that she sought such documentation and should not damage her credibility. Although this is a reasonable interpretation of Dr. Grant's notes, the ALJ looked at the record as a whole and interpreted the statement differently. Given that Dr. Grant had not seen Comer for over three months and obtained minimal findings when he examined her, that Comer reported little or no benefit from the treatments he recommended, and that evidence elsewhere in the record shows general lack of compliance with prescribed treatment, the ALJ could reasonably interpret Dr. Grant's notes to suggest that Comer was motivated more to receive benefits than to receive effective treatment.

Furthermore, even excluding Dr. Grant's statement, other medical source statements support the ALJ's reasoning. In June 1997, George Getty, MD, a urologist opined that after convalescence from her bladder surgery, Comer should be able to return to full activity without limitations. Tr. 438. He did not see any functional limitation from her diabetes, fibromyalgia or general medical condition. *Id.* He opined that "quite honestly I think this lady is taking advantage of the system and as a result has been given numerous medications that really don't do much for her." *Id.*

In addition, in April 2001, Dr. Foutz performed a consultative evaluation for fibromyalgia, knee pain, degenerative joint disease, osteoarthritis and chronic pain. Tr. 1007-15. Dr. Foutz found that Comer had a strong tendency toward pain magnification. Tr. 1014. She demonstrated a "severe, almost disruptive, tendency toward pain behavior," gave near minimal effort, had "very

distinct" step-off and give-way responses on strength tests, and despite her complaints was able to perform basic walking, squatting and standing functions. Tr. 1011-12. Dr. Foutz felt her evaluation did not indicate any physical limitations. Tr. 1011-14.

When Comer established care with Derrick Sorweide, DO, he believed that her poor attitude and lack of motivation were prominent factors in her continued poor health. Tr. 1075. The ALJ could reasonably interpret these treatment notes in the context of the record as a whole to indicate that Comer's motivation in seeking medical treatment was questionable.

Finally, the ALJ relied on the opinions of treating physicians who believed Comer remained capable of performing significant work activities. Tr. 467. For example, in August 1996, Douglas T. Burwell, MD, found her capable of sitting, standing, walking, speaking, hearing and using transportation without difficulty. Tr. 327. He found limitations in lifting, bending, carrying and handling due to obesity and hypertension, but felt these could be resolved by following his treatment plan for prescribed medication, diet control, exercise and weight reduction. *Id.* In September 1996, Dr. Grant opined that Comer was medically stationary and could do light/medium work activities. Tr. 319-20. In April 1997, Dr. Peterson opined that Comer's somatization of pain, hypertension and diabetes did not disable her. Tr. 412.

The combination of objective and clinical medical evidence showing essentially minimal findings, the demonstrated failure to comply with a broad range of treatment recommendations, evidence of low motivation to obtain effective medical care, and medical opinions that Comer remains capable of performing significant work activities support the ALJ's credibility determination. *Smolen*, 80 F3d at 1284.

///

**B.    Medical Source Statements**

Comer contends that the ALJ failed to accurately evaluate her RFC because he improperly rejected the opinions of Drs. Grant, Burwell and Williamson.  The ALJ can reject the opinion of a treating physician in favor of the conflicting opinion of another treating or examining physician if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002), quoting *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989).  An uncontradicted opinion may only be discredited for clear and convincing reasons.  *Thomas v. Barnhart*, 278 F3d at 956-57.

**1.    Dr. Grant's Physical Capacities Evaluation**

Dr. Grant performed a Physical Medicine and Rehabilitation consultation and electrodiagnostic evaluation in June 1996. Tr. 309-11.  He found osteoarthritis of a generalized type in the neck, shoulders and upper arms and prescribed physical therapy.  Tr. 311.  When Dr. Grant next saw Comer three months later, she reported that she felt about the same after 12 physical therapy sessions. Tr. 318.  Dr. Grant opined that Comer was "medically stationary and can do light/medium duty work activities as per PCE filled out this day."  Tr. 319.

Dr. Grant attached a physical capacities worksheet ("PCE") indicating that Comer could work full time at sedentary, light and light/medium work.  Tr. 320.  He indicated that Comer could sit for up to one hour at a time for a total of six hours in a workday and stand or walk for one-half hour at a time for a total of four hours in a workday.  *Id.*  Dr. Grant found that Comer could occasionally bend, squat, stoop, twist, crawl, kneel, climb, drive and perform overhead activity, could frequently look up or down, rotate her neck and raise her arms up to 90 degrees to the front or side, but could only occasionally raise the arms more than 90 degrees.  *Id.*

Comer argues that the ALJ did not include the limitations from Dr. Grant's PCE in his RFC assessment or give any reason for rejecting them. The ALJ considered Dr. Grant's opinion and relied on his finding that Comer remained capable of performing up to light/medium work. Tr. 467. However, the RFC assessment failed to account for all of the limitations on the PCE.

The ALJ's RFC assessment included lifting limitations and a sit/stand option that are consistent with the exertion limits and sitting, standing and walking restrictions in Dr. Grant's PCE. Tr. 320, 468. However, the RFC assessment did not include postural limitations or restrictions on neck and arm movements. The Commissioner argues that this was harmless because the ALJ elicited testimony from the VE based on a hypothetical worker who could not climb or crawl, and only occasionally stoop or kneel. Tr. 1310-1311. However, the ALJ did not address Dr. Grant's limitations of occasional bending, squatting, twisting and overhead reaching in either the RFC assessment or the vocational inquiry.

The Commissioner argues that there is no credible evidence that Comer has any limitations in addition to those in the ALJ's RFC assessment and hypothetical vocational question. This argument is supported by Dr. Foutz' August 1996 opinion that Comer had no physical limitations and Dr. Burwell's April 2001 opinion that many of her physical limitations would resolve if she followed her treatment plan. Tr. 327, 1011-14. However, the ALJ did not assert that reason for discrediting Dr. Grant's PCE findings, and the court is constrained to review the reasons he asserted. *Connett v. Barnhart,* 340 F3d 871, 874 (9th Cir 2003).

### 2.    Dr. Burwell's Treatment Notes

Dr. Burwell performed a consultative evaluation of severe hypertension in July 1996. Tr. 321-24. He found that Comer had severe hypertensive cardiovascular disease and recommended

a treatment plan including hypertension medication, diet control and exercise.  Tr. 324.  He also recommended that she "lie down for one hour twice daily."  *Id.*

Comer argues that the ALJ improperly assessed her RFC because he did not reflect that she must lie down for one hour twice daily.  This court is satisfied that Dr. Burwell's recommendation was a temporary measure to reduce the risks of severe uncontrolled hypertension.  In August 1996, Dr. Burwell indicated that if Comer used medications as prescribed, followed a strict weight reduction diet and got regular exercise, then she would be able to control her hypertension and resume a productive life.  Tr. 327.

Comer did not follow Dr. Burwell's treatment plan with respect to diet and exercise.  Tr. 330.  Despite this, her hypertension was well controlled by medication in January 1997, and lying down was no longer among Dr. Burwell's recommendations.  Tr. 382-83.  Her hypertension remained controlled when she complied with her prescriptions.  Tr. 393, 852, 903.  No medical source has suggested that lying down during the day was necessary while her hypertension was controlled.  Other than Dr. Burwell's one-time recommendation in July 1996, there is no suggestion in the record that Comer had an ongoing need to lie down during the day.  Accordingly, the ALJ did not err by excluding this recommendation from his RFC assessment.

### 3.  Dr. Williamson's Disability Opinion

Dr. Williamson performed a psychiatric evaluation of Comer in March 1996, when her chief complaint was anxiety.  Tr. 345-46.  In April 1997, she began regular visits at intervals of one to three months through the relevant period.  Tr. 345-53, 1027-60.  Comer's anxiety and depression improved and by December 1999 she stabilized on antidepressant medication.  Tr. 1039.

In March 2000, she began to worry about her Social Security claim, but remained stable psychiatrically. Tr. 1036. In November 2000, Comer reported that her Social Security claim had been denied and that "no one seems to believe that her arthritis problems are disabling." Tr. 1033. Dr. Williamson opined that Comer was disabled by her orthopedic conditions:

> My sense in this is that what's disabling is a bit of a gray area when it comes to the sorts of orthopedic problems that Annette faces. Thus, the real test is whether Annette would be employable in the sorts of jobs that she is prepared for given her orthopedic situation, and I think in this case, the answer is clearly no.

Tr. 1033.

Dr. Williamson did not treat Comer's orthopedic conditions, and the records do not indicate that he performed any physical examination or consulted the treatment notes of the physicians who treated her orthopedic conditions. He looked at an MRI scan of her cervical spine in January 1999, but did not attempt to interpret it other than to raise a question for Comer to ask her pain and spine specialist, Dr. Ewald. Tr. 1046.

In January 2001, Dr. Williamson noted:

> It seems to me that it's probably true that if you look at Annette as strictly an arthritis patient or strictly as a depression patient, that her symptoms are not disabling. But if you look at her entirety, with arthritis and fibromyalgia and cardiac problems, that she does qualify for disability.

Tr. 1032.

Again, the record does not show that Dr. Williamson was in position to accurately assess Comer's "entirety." He had no information, other than Comer's subjective statements, about her arthritis, fibromyalgia or cardiac problems.

In June 2001, Dr. Williamson wrote a letter informing the Social Security Administration that he was Comer's psychiatrist. He believed that Comer became unable to work in March 1996 due to "back pain and orthopedic conditions." Tr. 1027. He opined that Comer had been disabled continuously since that date and noted that their energy in treatment had been focused on the depression generated by her alleged inability to work. *Id.*

The ALJ gave Dr. Williamson's opinion that Comer has been disabled since March 1996 "nominal" evidentiary value. Tr. 465. He found that Dr. Williamson's own findings did not support disability. In a mental status report dated May 21, 2001, Dr. Williamson indicated that Comer was much improved on medication and able to care for herself and her mother as long as she paced herself and took frequent breaks. Tr. 1028. He assigned a global assessment of functioning code ("GAF") of 60, indicating moderate symptoms or moderate difficulty in any of the major categories of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed Text Revision 2000). Tr. 1030. The ALJ noted that Dr. Williamson's findings of moderate limitations were consistent with Comer's reports that her depression had improved with medication and with her reported activities of caring for herself and her mother, gardening and taking a six-week fishing trip to Alaska. Tr. 465.

Comer apparently argues that a GAF of 60 is *per se* disabling based on *Schneider v. Commissioner*, 223 F3d 968 (9th Cir 2000). The Court of Appeals found Schneider disabled based on lay witness statements that the ALJ improperly excluded from his evaluation. *Id* at 975. Although a psychiatrist assessed Schneider with a GAF score of 60, this was not the basis of her disability and does not assist Comer.

The ALJ found that Dr. Williamson's treatment records did not reflect any objective medical evidence to support his disability opinion. Tr. 465. Dr. Williamson's treatment notes reflect that he had Comer complete the Scheen Patient Rated Anxiety Scales and made clinical observations of her mood and attitude during their office visits. But he did not administer any other testing, perform any physical examination or review any other physician's treatment notes to support his opinion regarding Comer's orthopedic conditions, fibromyalgia and cardiac health.

Comer argues that the absence of objective evidence to support Dr. Williamson's disability opinion imposed a duty on the ALJ to recontact Dr. Williamson. Comer relies on SSR 96-5p, which states in part:

> if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

However, the ALJ had no difficulty ascertaining the basis of Dr. Williamson's opinion from the case record. He found Dr. Williamson's opinion that Comer was disabled due to orthopedic and cardiac conditions "obviously dependent almost wholly upon the claimant's subjective complaints and history." Tr. 465. This basis is supported by substantial evidence in the record described above.

Comer objects because the ALJ considered Dr. Williamson's specialty in evaluating his opinion regarding her non-mental health conditions. The ALJ noted that Dr. Williamson's disability opinion "depend[ed] on his forays into areas outside his stated limited practice [of psychiatry]." *Id.* Comer argues that Dr. Williamson's psychiatric specialty is irrelevant and that he is qualified to offer an opinion on the combined impact of her impairments. She cites *Lester v. Chater*, 81 F3d at 833, in which a physician provided treatment for the claimant's psychiatric impairment although he

was not a psychiatrist. The court held that the ALJ improperly disregarded the physician's opinion as to the claimant's mental functioning because he was not a mental health specialist.

Unlike the ALJ in *Lester*, the ALJ in this matter did not find Dr. Williamson incompetent to offer an opinion outside his specialty. He simply took his specialty into consideration in weighing the evidentiary value of the opinion. More importantly, the physician in *Lester* treated the claimant's mental health condition and based his opinion on knowledge derived from that treatment, as well as his medical expertise. In contrast, Dr. Williamson's opinion relates to conditions outside his specialty that he did not treat or have any medical information about.

Finally, the ALJ gave little weight to Dr. Williamson's disability opinion because it relied primarily on Comer's subjective statements which he found unreliable. An ALJ can properly reject a physician's disability opinion that is premised on the claimant's own subjective complaints which the ALJ has already properly discounted. *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989); *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001).

C.     **Evaluation of Mental Impairments**

Comer contends the ALJ's mental RFC findings are not supported by substantial evidence because he did not properly comply with the Psychiatric Review Technique described in 20 CFR §§ 404.1520a(d) and 416.920a(d). In cases where the claimant presents a colorable claim of mental impairment, the regulations require the ALJ's decision to

> incorporate the pertinent findings and conclusions based on the technique [including] the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s) [and] a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c).

20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2).

The functional areas described in paragraph (c) are four broad functional categories: restrictions of activities of daily living, difficulties maintaining social functioning, difficulties in maintaining concentration, persistence or pace and episodes of decompensation. 20 CFR §§ 404.1520a(c)(3), 416.920a(c)(3). Failure to incorporate these findings requires a remand. *Gutierrez v. Apfel,* 199 F3d 1048, 1051 (9th Cir 2000).

The necessary findings are set out in worksheet form on the standard Psychiatric Review Technique Form ("PRTF"). The ALJ did not complete a PRTF and attach it to his written decision. The case record includes an unsigned, undated PRTF with the required findings, but there is no basis to conclude that it represents the ALJ's findings. Tr. 761-73. Agency consulting psychologist Dorothy Anderson, PhD, completed a PRTF dated September 5, 2001, with findings that would satisfy the regulations. Tr. 1108-21. However, there is no indication in the written decision that the ALJ adopted Dr. Anderson's findings.

In his description of Comer's psychiatric treatment history with Dr. Williamson, the ALJ discussed the diagnoses and reported functional limitations he considered in evaluating the severity of her mental impairments. Tr. 464-65. In determining that Comer's mental impairments were not equivalent in severity to any presumptively disabling condition in 20 CFR Part 404, Subpart P, Appenix 1 ("Listing of Impairments"), the ALJ found that Comer did not have marked restrictions of activities of daily living, marked difficulties maintaining social functioning, frequent deficiencies in concentration, persistence or pace or repeated episodes of decompensation. Tr. 466. However, he failed to make a specific finding as to the degree of limitation in each of these functional areas.

This deprives the court of the ability to review whether the ALJ's RFC assessment reflects all of Comer's mental functional limitations. The ALJ's findings are sufficient to support his

conclusion that Comer does not have a mental impairment that meets the Listing of Impairments, but are insufficient to demonstrate that he gave adequate consideration to the impact her mental condition might have on her RFC. His failure to demonstrate compliance with the regulatory Psychiatric Review Technique requires a remand to the Social Security Administration. *Gutierrez,* 199 F3d at 1051.

## II.  Step Five Determination

Comer contends the ALJ reached the conclusion that she can perform work in the national economy based on vocational testimony that did not consider all of her limitations and conflicted with information in the *Dictionary of Occupational Titles* ("DOT").

In step five, the Commissioner must show that the claimant can do work which exists in the national economy. *Yuckert*, 482 US at 141-42; *Tackett*, 180 F3d at 1099. She can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that accurately reflects all the limitations of the claimant or she can apply the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. *Tackett,* 180 F3d at 1099, 1101.

### A.  Vocational Hypothetical

The ALJ elicited testimony from the VE based on hypothetical questions that reflected his RFC assessment. However, because he did not properly consider all of the limitations identified on Dr. Grant's PCE worksheet and did not comply with the regulatory Psychiatric Review Technique, it is unclear that his hypothetical questions reflected all of Comer's limitations. Because the assumptions underlying the VE's opinion may not reflect all of Comer's limitations, the ALJ could not rely on the vocational testimony to show that Comer could perform the work identified. *Embrey v. Bowen,* 849 F2d 418, 422 (9th Cir 1998).

**B.** <u>**Conflicts With the DOT**</u>

For information about the requirements of work, the Commissioner relies primarily on the DOT. 20 CFR Part 404, Subpart P, Appendix 2 § 200.00(b); *see also* SSR 00-4p. The ALJ may also use a VE to provide information about the requirements of a particular job. SSR 00-4p.

When a VE provides information about the requirements of an occupation, the ALJ must determine whether that information conflicts with the DOT and obtain a reasonable explanation for the apparent conflict. If testimony provided by a VE is inconsistent with DOT work requirement information, the ALJ must resolve the conflict before relying on the testimony to find that a claimant is not disabled. The ALJ must explain how the conflict was resolved. *Id.* An ALJ may rely on expert testimony which contradicts the DOT only if the record contains persuasive evidence to support the deviation. *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995).

Comer contends the DOT work requirement information for the occupations of mail clerk and office helper include abilities that exceed the ALJ's RFC assessment. In particular, she contends that the DOT work requirements for both jobs include reasoning abilities that exceed the ALJ's finding that she can follow only "simple routine tasks and instructions." Tr. 468, 470. She contends the DOT work requirements for the occupation of mail clerk include the ability to work with precise limits, tolerances and standards, contrary to the ALJ's finding that she must work with "no strict quality standards or production rates." *Id.* Lastly, she contends the DOT work requirements for the occupation of office helper requires adjusting to a variety of duties, contrary to the ALJ's finding that she should perform "simple routine tasks." *Id.*

It is not necessary for the court to determine whether the VE's testimony conflicts with the DOT at this juncture, because the case must be remanded for other reasons. The proceedings after

remand could produce a different RFC assessment and different testimony from the VE. In that event, resolving this issue as it is presented now would serve no purpose.

## III.   <u>Remand</u>

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989). Improperly rejected evidence should be credited and an immediate award of benefits directed where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F3d at 1178, quoting *Smolen v. Chater*, 80 F3d at 1292.

Of course, the third prong of this test is actually a subpart of the second. *See id* at 1178 n 7. Here the court should exercise its discretion to remand for further proceedings. The errors identified in these findings do not resolve all issues, compel a determination of disability or demonstrate that further proceedings would serve no useful purpose.

The ALJ's failure to clearly state an RFC assessment for the period after Comer's insured status expired does not require an immediate award of benefits. The evidence in the record as a whole does not suggest that Comer's RFC changed after that date. Even assuming her RFC

changed, a finding of disability would not be appropriate without VE testimony indicating that her changed RFC assessment precluded all work.

Crediting the improperly rejected evidence would not require a determination of disability. The ALJ's failure to address a small part of Dr. Grant's PCE worksheet does not warrant an award of benefits because the VE has not considered whether the additional limitations of occasional bending, squatting, twisting and overhead reaching would preclude all work. It seems unlikely that the occupations of mail clerk and office helper would require these activities more than occasionally, but the court cannot make that finding independently without additional vocational evidence.

Similarly, the ALJ's omission of compliance with the regulatory Psychiatric Review Technique does not warrant an immediate award of benefits because it has not been shown that this will result in any change in Comer's RFC assessment. Even if demonstrating compliance with the Psychiatric Review Technique identifies additional mental impairments, there is no VE testimony to support a finding that the additional mental impairments would preclude all work.

## **RECOMMENDATION**

Based on the foregoing findings and conclusions, the Commissioner's final decision should be reversed and remanded for further proceedings. The Commissioner should be directed to address all of Dr. Grant's findings, demonstrate compliance with the regulatory Psychiatric Review Technique, and clarify the RFC assessment with respect to the applicable period for each of Comer's claims. A final judgment should be entered pursuant to sentence four of 42 USC § 405(g).

///

///

///

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due October 14, 2005. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 27th day of September, 2005.


/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge